**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JERMAINE STROUD | * |
| Plaintiff | * |
| v | *   Civil Action No. ELH-12-1354 |
| WARDEN, *et al.* | * |
| Defendants | * |

\***

## MEMORANDUM

Plaintiff Jermaine Stroud ("Stroud"), a prisoner in the custody of the Maryland Division of Correction, alleges he was assaulted multiple times by various correctional officers, who are defendants. ECF 1, 3. The complaint concerns events which occurred at Maryland Reception Diagnostic Classification Center ("MRDCC") as well as Western Correctional Institution ("WCI"). Plaintiff seeks monetary and equitable relief.

Warden Tyrone Crowder, Lt. Quentin Ragin, CO II Kwasi Ramsey, and CO II Preston Cameron, defendants, have moved to dismiss or, in the alternative, for summary judgment. ECF 11. Although plaintiff was advised of his right to file a response in opposition to defendants' motion and of the consequences of failing to do so, *see* ECF 12, plaintiff has not done so. ECF 12.[1] Upon review of the papers submitted, the court finds a hearing in this matter is unnecessary to resolve the issues. *See* Local Rule 105.6.

**Background**

Stroud claims that on April 6, 2012, at around 11:00 a.m., he was out of his cell for recreation time at MRDCC, when he was assaulted by Lt. Ragin and Correctional Officers

---

[1] In accordance with *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), plaintiff was informed of his right to file a response to the Motion, and the opportunity to submit affidavits, declarations, and other documentary evidence.

Ramsey, Cameron, and two unknown officers. According to plaintiff, he was slammed to the floor, where his neck was stepped on and his fingers were bent. He was then held upright, presumably by Ramsey and Cameron, while Lt. Ragin "took shots at [his] face." After Stroud was assaulted, he was put into a van and driven to WCI, where he was placed on a housing unit with inmates serving life sentences. Stroud further claims he was given nothing for days while he was assigned to this cell at WCI, and spent days spitting blood and going without food. ECF 3 at 3.

Stroud included with his amended complaint a copy of a Request for Administrative Remedy, which he apparently filed shortly after his arrival at WCI. ECF 3, Attachment 1. In his Request, Stroud asserts that he was restrained in a "three-piece" during the assault. Further, Stroud claims that, prior to the assault on April 6, 2012, he had "a few words" with the officer stationed on his housing tier and had asked to see a supervisor. *Id*. at p. 2. He alleges that Ragin called for additional officers to come to the area and as soon as Ragin put down the phone, the officers grabbed him and threw him to the floor, while he was in restraints. Stroud alleges that Ragin stepped on his neck so hard that he could not breathe and that another officer was sitting on his chest while a third officer was bending his fingers. Additional officers arrived after inmates who were witnessing the encounter began to make noise. Stroud was then lifted up and carried into a hallway. Stroud claims Ragin told two officers to hold him up and proceeded to take five or six "shots" at his face. *Id*. Further, he claims he remained restrained the entire time and that his face was bleeding as a result of the force used against him.

In the same Request, Stroud asserts that a nurse came into the room where he had been taken and he reported to her that his entire body hurt very badly. The nurse told the officers to take the restraints off Stroud, but one of the officers took the nurse out into the hallway and told

her something.  When she returned, Stroud noticed a change in her attitude.  Stroud responded to the change of atmosphere by becoming "real loud" in order to get someone's attention.  At this point, the officers again assaulted Stroud, who remained restrained.  Stroud claims that during this second assault he lost consciousness and awoke to officers picking him up and putting him in a van.  He was driven to WCI and claims he was not provided a bed or mattress in the cell he was assigned.  As a result of the assaults, Stroud claims he was spitting up blood, had no feeling in his hands, and injured his back.  Despite his repeated requests for medical attention, Stroud asserts that no one would allow him to be seen because he was not supposed to be at WCI.  ECF 3 at Attachment 1, pp. 2 – 3.

Defendants deny assaulting Stroud.  Officer Ramsey states that on April 6, 2012, he went to Stroud's housing unit and Stroud came out of his cell for recreation wearing handcuffs secured in front of his body.  When Ramsey attempted to apply the rest of the three piece restraint set used when escorting inmates with a history of combativeness,[2] Stroud refused to comply with the process.  Ramsey gave Stroud several orders to comply, but he continued to refuse.  Ramsey then ordered Stroud to step back into his cell; Stroud also refused to obey that order.  Stroud then forcefully pulled away from Ramsey's grasp as Ramsey attempted to apply the three piece restraint.  Ramsey grabbed Stroud's legs and Corporal Wallace grabbed his torso.  The two officers lifted Stroud off of his feet and placed him on the floor where Ramsey was able to successfully apply the three piece restraints.  Stroud was then lifted off of the floor, placed on his feet, and escorted to the medical department by Ramsey and Cameron without further incident.  ECF 11 at Ex. A.

---

[2] Stroud's prison file indicated that he had such a history.  ECF 11 at Ex. A.

Although Stroud was taken to the medical department as a matter of protocol, he did not have any discernible injuries.  Defendants deny slamming Stroud to the floor, stepping on his neck, bending his fingers, sitting on his chest, or holding him aloft while Ragin struck him.  ECF 11 at Ex. A, D, and E.  Upon arrival at the medical unit, Officer Cameron began to remove Stroud's restraints, but Stroud began threatening harm to Cameron.  When Cameron then attempted to reapply the restraints, Stroud began to struggle wildly, preventing Cameron from securing the restraints properly.  A response team arrived after Cameron called for assistance.  Stroud was again placed on the floor, and the restraints were reapplied.  Stroud was put in the holding cell in the medical unit.  ECF 11 at Ex. D.  He continued to be disruptive by kicking the door of the holding cell and was advised by Captain Michelle Mann that, once he calmed down, he would be thoroughly evaluated by medical staff.  Stroud replied that he did not want anyone to touch him.  And, he continued to threaten bodily harm to staff and refused a second offer for medical treatment.  Approximately one hour later, Stroud was transferred to WCI.  *Id*. at Ex. G.

Stroud was later served with a Notice of Infraction for disobeying a direct lawful order and for being involved in any manner with a disruptive activity.  Stroud pled guilty to disobeying a direct lawful order on May 14, 2012, and received a disciplinary segregation sentence of 45 days.  ECF 11 at Ex. C. An investigation into the use of force incident concluded that the force used was spontaneous and that the minimum amount of force required was used.  Stroud refused to provide a statement to the investigating officer, Lt. Neil Dupree.  *Id*. at Ex. H.

Defendants state that upon Stroud's arrival at WCI he was seen at the medical unit, indicated he was injured, but no injuries were observed. ECF 11 at Ex. I and J.  Stroud later complained he was coughing blood prompting another medical evaluation on April 19, 2012.  Medical staff who examined Stroud did not observe him coughing up blood and noted his lungs

4

were clear; he was referred to a clinician for follow up. *Id.* at Ex. I, p. 8. On May 9, 2012, Stroud was given an opportunity to be seen for the referral, but he refused. *Id.* at p. 13. Stroud never indicated to medical staff that he was being denied food. *Id*. at pp. 2-13.

Because Stroud assaulted staff at MRDCC, he was placed on staff alert when he arrived at WCI, where he remained from April 6, 2012 through April 9, 2012. Staff alert status is used to determine if an inmate poses a substantial security threat to the institution. Stroud was provided with hygiene items, a jumpsuit, and three meals a day while on staff alert status. ECF 11 at Ex. J.

**Standard of Review**

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.[3] Defendants appended twelve exhibits to their Motion, including several Declarations and plaintiff's medical records. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). *See Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A]

---

[3] The motion is supported by declarations under oath and verified business records. ECF 11 at Ex. A, D, E, G, H, J, K, and L.

5

Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[4]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds

---

[4] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)). *See also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010).

that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). Plaintiff has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address the defendants' motion as one for summary judgment.

Summary Judgment is governed by Fed. R. Civ. P. 56(a). It provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. It has said:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson,* 477 U. S. at 247-48 (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

7

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). In resolving a summary judgment motion, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Notably, because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, the court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

*Excessive Force*

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U. S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkens v. Gaddy*, __ U.S. __, 130 S. Ct. 1175 (2010). The extent of injury incurred is one factor indicative of whether or not the force used

was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*.

*Medical Care*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (*citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). To state a claim under 42 U.S.C. § 1983 based on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to insure that the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). And, as noted, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the injury. The plaintiff must prove "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at

839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).

Even if the requisite knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken.).

Notably, prison officials are entitled to rely on medical judgments and expertise of prison physicians and medical personnel concerning the course of treatment deemed necessary for prisoners. *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with a prisoner's medical treatment ordered by such personnel). Mere negligence or malpractice does not rise to a constitutional level. *See Estelle*, 429 U.S. at 105-06. Rather, the medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience, or be intolerable to fundamental fairness. *See Miltier*, 896 F.2d at 851.

An inmate's disagreement with medical providers about the proper care and course of treatment does not support a § 1983 claim, in the absence of "exceptional circumstances." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975). This is because an inmate does not

have a constitutional right to specific medical treatment on demand, simply because he thinks he needs a certain procedure, nor does he have a constitutional right to be treated by a specific doctor, nurse, or other medical personnel. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("Society does not expect that prisoners will have unqualified access to health care.").

*Conditions of Confinement*

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that "the deprivation of [a] basic human need was *objectively* sufficiently serious," and that "*subjectively* the officials acted with a sufficiently culpable state of mind."

*Shakka*, 71 F.3d at 166 (emphasis in original; citation omitted).

"[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). Prison officials cannot be held liable for violating the Eighth Amendment unless they knew of, and then disregarded, an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 834.

*The Warden*

Plaintiff does not claim that the Warden had any personal involvement in what occurred. The law is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Monell v. New York Department of Social Services*, 436 U.S. 658, 691 (1978); *Love-*

*Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).[5]

"[L]iability under § 1983 is conditioned on a showing of some personal involvement or participation in the denial of civil rights." *McAdoo v. Toll*, 591 F.Supp. 1399, 1404 (4th Cir. 1984). "In a § 1983 suit … masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.Ct. 1937, 1949 (2009); *see Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Company*, 678 F.2d 504, 506 (4th Cir. 1982).

In the context of this case, Section 1983 liability on the part of a supervisor requires a showing that: (1) the supervisory defendant failed promptly to provide an inmate with needed medical care; (2) the supervisory defendant deliberately interfered with the prison doctors' performance; or (3) the supervisory defendant tacitly authorized or was indifferent to the use of excessive force or unlawful prison conditions. *See Miltier*, 896 F.2d at 854; *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

To the extent that plaintiff seeks to hold the Warden culpable under a theory of supervisory liability, his claims are unavailing. Supervisory liability under § 1983 must be supported with evidence that: 1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; 2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and 3) there was an affirmative causal link between the supervisor's inaction

---

[5] The doctrine of vicarious liability is commonly referred to as respondeat superior. Respondeat superior is a legal doctrine by which an employer may be held responsible for the actions of its employees.

and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Plaintiff does not claim that the Warden had actual or constructive knowledge of the incidents in question, nor are there any grounds alleged for assigning supervisory liability.  For example, Stroud does not allege that the Warden was aware of and disregarded an excessive risk to Stroud's health or safety.  *See Farmer*, 511 U.S. at 837; *Rich*, 129 F.3d at 340 n.2.  Further, the Warden was entitled to rely on the opinions of medical professionals concerning plaintiff's treatment.  For these reasons, the Warden is entitled to summary judgment in his favor.

The undisputed facts in this case also establish that the use of force was necessitated by Stroud's own behavior and resulted in no injury to him.  Thus, the Eighth Amendment claim regarding excessive use of force must fail.  The Eighth Amendment claims regarding the conditions of plaintiff's confinement at WCI and the alleged failure to treat him medically must also fail.  The undisputed facts establish that Stroud refused medical care that was offered to him and that he was provided with the essentials required during his brief stay on staff alert status at WCI.  Defendants' motion, construed as one for summary judgment, shall therefore be granted by separate Order, which follows.


<u>November 16, 2012</u>                                              <u>         /s/                                             </u>
Date                                                                            Ellen L. Hollander
                                                                                United States District Judge